UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JAMIE MARIE WILLIAMS,

                    Plaintiff,          Civil Action No. 18-10052

                                    Honorable Laurie J. Michelson

v.                                Magistrate Judge David R. Grand

NANCY A. BERRYHILL,
Acting Commissioner,
Social Security Administration,

                    Defendant.

_____/

## REPORT AND RECOMMENDATION
## ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [15, 16]

Plaintiff Jamie Marie Williams ("Williams") brings this action pursuant to 42 U.S.C. § 405(g), challenging the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions (Docs. #15, #16), which have been referred to this Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

## I.    RECOMMENDATION

For the reasons set forth below, the Court finds that substantial evidence supports the Administrative Law Judge's ("ALJ") conclusion that Williams is not disabled under the Act. Accordingly, the Court **RECOMMENDS** that the Commissioner's Motion for Summary Judgment (**Doc. #16**) be **GRANTED**, Williams' Motion for Summary Judgment (**Doc. #15**) be **DENIED**, and that pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision be **AFFIRMED**.

## II.     REPORT

### A.  Background

Williams filed for both DIB and SSI on March 26, 2015.  (Tr. 273, 278).  She also previously filed for SSI and DIB, which were denied in a written decision by the ALJ on February 19, 2015.  (Tr. 172-82).[1]  Williams now alleges disability due to "lower back problems, vision problems, migraines, right hand problems, and high blood pressure."  (Tr. 276).  Williams' application was denied initially on June 5, 2015.  (Tr. 209, 219).  Williams then timely requested

---

[1] Although the ALJ wrote that she was bound by the previous findings in the absence of change, pursuant to *Drummond v. Commissioner of Social Security*, 126 F.3d 837 (6th Cir. 1997), the ALJ also explained that the record "demonstrates deterioration" in Williams' condition since the prior decision, such that the prior decision was not binding.  (Tr. 122).  The ALJ therefore adopted the prior decision only in part, as the "previous RFC did not fully accommodate the limitations present."  (*Id.*).  Nonetheless, because the ALJ cited the agency's acquiescence under *Drummond*, the Commissioner filed a Notice of Supplemental Authority, citing the recent Sixth Circuit case, *Earley v. Commissioner of Social Security*, 893 F.3d 929 (6th Cir. 2018), which modified *Drummond* by clarifying that "[a]n individual may file a second application—for a new period of time—for all manner of reasons and obtain independent review of it so long as the claimant presents evidence of a change in condition or satisfies a new regulatory threshold. . . . When an individual seeks disability benefits for a distinct period of time, each application is entitled to review."  *Earley*, 893 F.3d at 932-33.  In the Notice, the Commissioner quoted the following passage from *Earley*:

> *Drummond* referred to "principles of res judicata"—with an accent on the word "principles."  126 F.3d at 841-43.  What are those principles?  Finality, efficiency, and the consistent treatment of like cases.  An administrative law judge honors those principles by considering what an earlier judge found with respect to a later application and by considering that earlier record.  *Id.* at 842; *see Albright v. Comm'r of Soc. Sec.*, 174 F.3d 473, 478 (4th Cir. 1999).  That is why it is fair for an administrative law judge to take the view that, absent new and additional evidence, the first administrative law judge's findings are a legitimate, albeit not binding, consideration in reviewing a second application.

(Doc. #18) (quoting *Earley, supra* at 933).

Williams did not file a response to the Commissioner's Notice, nor did she raise any issue related to *Drummond* in her motion.  Here, because the ALJ acknowledged the change in Williams' conditions since the prior findings, and imposed a new and more restrictive RFC, she satisfied the standard set forth in *Earley*.

a hearing, which was then held on October 5, 2019, before Administrative Law Judge ("ALJ") Kari Deming.  (Tr. 115-29).  At the hearing, Williams, represented by counsel, testified, as did impartial Vocational Expert ("VE") Pauline Mceachin.  (Tr. 115).  On December 14, 2016, the ALJ issued an unfavorable decision, which Williams then appealed on December 30, 2016.  (Tr. 271-72).  The Appeals Council denied review on November 3, 2017, and Williams filed the instant complaint thereafter.  (Tr. 1-6, Doc. #1).

Williams was 54 years old on her alleged onset date of February 20, 2015.  (Tr. 187).  She has an 11th grade education, and was trained as a CNA.  (Tr. 136-37).  Williams has work experience as a casino cashier, housekeeper, and currency counter, and her last work was in August 2013.  (*Id.*).  Although she has a driver's license, she has not driven since 2013, due to her conditions.  (Tr. 136).  She wears a carpal tunnel brace, and testified that she cannot handle coffee cups, button buttons, or zip zippers, but can lift up to ten pounds using both hands.  (Tr. 140-41). She testified that she lies down for an hour per day, and throughout the rest of the day, she rotates between sitting and standing.  (Tr. 142).  She testified that she could sit "[a]t least 30 minutes without a break" and that she could stand 30 minutes at a time.  (Tr. 141-42).  At her previous job as a data entry clerk, she had a sit/stand option.  (Tr. 138).

The Court has thoroughly reviewed the record in this matter, including Williams' medical record, Function Report, Disability Reports, and testimony as to her conditions and resulting limitations.  Instead of summarizing that information here, the Court will make references and provide citations to the record as necessary in its discussion of the parties' arguments.

### B.  ALJ application of disability framework

Under the Act, SSI and DIB are available only for those who have a "disability."  *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability" as the

"inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.
>
> Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
> Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that the claimant can perform, in view of his or her age, education, and work experience, benefits are denied.

*Scheuneman v. Comm'r of Soc. Sec.*, 2011 WL 6937331, at *7 (E.D. Mich. Dec. 6, 2011) (citing 20 C.F.R. § 404.1520); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "The burden of proof is on the claimant throughout the first four steps …. If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]." *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

Following this five-step sequential analysis, the ALJ found that Williams is not disabled under the Act. At Step One, the ALJ found that Williams had not engaged in substantial gainful

4

activity since February 20, 2015, the alleged onset date.  (Tr. 120).  At Step Two, the ALJ found

that Williams has the following severe impairments: limited vision in right eye, right carpal tunnel

syndrome, essential hypertension, lumbago, and headaches.  (Tr. 120-121).  At Step Three, the

ALJ found that Williams' impairments, whether considered alone or in combination, do not meet

or medically equal a listed impairment.  (Tr. 122).

The ALJ then assessed Williams' residual functional capacity ("RFC"), concluding that

she is capable of performing sedentary work, except that she can frequently handle, finger, and

feel with the right hand; never be exposed to flashing light or light of greater brightness/intensity

than found in a typical grocery store; never be exposed to workplace hazards; and no complex

duties.  (*Id.*).  At Step Four, the ALJ found that Williams is capable of performing past relevant

work as a casino cashier, as the work does not require the performance of work-related activities

precluded by her residual functional capacity.  (Tr. 125).

### C.  Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative

decision pursuant to 42 U.S.C. § 405(g).  Judicial review under this statute is limited in that the

court "must affirm the Commissioner's conclusions absent a determination that the Commissioner

has failed to apply the correct legal standard or has made findings of fact unsupported by

substantial evidence in the record."  *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th

Cir. 2005) (internal citations omitted).  Substantial evidence is "more than a scintilla of evidence

but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion."  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir.

2007) (internal quotations omitted).  In deciding whether substantial evidence supports the ALJ's

decision, the court does "not try the case *de novo*, resolve conflicts in evidence or decide questions

of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007).

When reviewing the Commissioner's factual findings, the court is limited to an examination of the record and must consider the record as a whole. *See Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001); *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). There is no requirement, however, that either the ALJ or this court discuss every piece of evidence in the administrative record. *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted).

### D.  Analysis

In her motion for summary judgment, Williams argues that the ALJ erred: (1) by violating the treating physician rule by improperly weighing and evaluating the opinion evidence of Kai Palm, M.D., Williams' treating physician; (2) in her RFC determination; and (3) in the Step Four determination that Williams could perform her past relevant work. Each issue is addressed below.

#### 1.  *The ALJ Did Not Violate the Treating Physician Rule*

Williams argues that "[t]he ALJ failed to follow the treating physician rule when discounting the opinion of Dr. Palm, instead subordinating it to her own lay opinion regarding

[Williams'] physical limitations."  (Doc. #15 at 21).  This argument lacks merit as, overall, the ALJ provided good reasons for giving little weight to Dr. Palm's opinions, and substantial evidence from the record supports her decision.

Dr. Palm is Williams' primary care physician at Covenant Community Care Clinic.  He began treating Williams on July 9, 2014, and has treated her for a variety of conditions since.  (Tr. 412).  Dr. Palm completed a Physical Assessment on August 25, 2016, in which he imposed extreme restrictions on Williams' functional abilities.  (Tr. 579-80).  Dr. Palm opined that Williams' symptoms are frequently severe enough to interfere with the attention and concentration required to perform simple work-related tasks, and noted that the side effects of Williams' medications include drowsiness, forgetfulness, and fatigue.  (*Id.*).  He also indicated the following limitations: Williams would need to recline or lie down in excess of the typical 15-minute break in the morning, the 30-60 minute lunch break, and typical 15 minute break in the afternoon; she could sit for four hours total in an 8-hour workday, and stand/walk for only 1 hour total; and she would need approximately one 5-10 minute break every 30-60 minutes.  (*Id.*).  Dr. Palm also opined that Williams had the following limitations with repetitive reaching, handling, and fingering: as to her right hand, she could only grasp, turn, or twist objects, perform fine manipulation, and reach less than 10% of the time; and as to her left hand, she could do those tasks only 50% of the time.  (*Id.*).  Finally, he opined that Williams would be absent from work more than four times a month, and her impairments were reasonably consistent with the symptoms and functional limitations described.  (*Id.*).

The ALJ considered Dr. Palm's opinion as follows,

> As to the opinion evidence, a Physical Assessment report dated August 25, 2016, prepared by Kai Palm, M.D., indicated that the claimant was unable to perform even a reduced range of sedentary work on a continuing and ongoing basis.  The claimant was found to be capable of sitting four hours in an eight

hour workday, standing/walking one hour in an eight hour workday, and lifting ten pounds occasionally. Left hand manipulative limitations were also found. It was also noted that the claimant would likely be absent from work more than four times per month. The opinions of Dr. Palm are given little weight because they are grossly inconsistent with the evidence as a whole. The medical evidence indicates that physical examinations were mostly unremarkable. The claimant was capable of walking thirty minutes at one time. Furthermore, there is no evidence to support a fifty-percent limitation with left handed manipulative functioning. There are no diagnostic findings showing an underlying condition that would cause manipulative limitations.

(Tr. 124).

"Generally, the opinions of treating physicians are given substantial, if not controlling, deference," but they "are only given such deference when supported by objective medical evidence." *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004) (citing *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984) and 20 C.F.R. § 404.1527(d)(2)). Thus, an ALJ "'must' give a treating source opinion controlling weight if the treating source opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and is 'not inconsistent with the other substantial evidence in [the] case record.'" *Blakley v. Comm'r of Soc. Sec.,* 581 F.3d 399, 406 (6th Cir. 2009) (internal quotations omitted); SSR 96-8p, 1996 WL 374184, at *7 (July 2, 1996). However, it is "error to give [a treating source] opinion controlling weight simply because it is the opinion of a treating source" unless it is well-supported and consistent with the record as a whole. SSR 96-2p, 1996 WL 374188, at *2 (July 2, 1996).

If the ALJ declines to give a treating physician's opinion controlling weight, he must document how much weight he gives it, considering a number of factors, including the "length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (citing 20 C.F.R. § 404.1527(c)(2) (establishing that the ALJ must "give good

reasons" for the weight given to a treating source opinion)).  "Although the regulations instruct an ALJ to consider these factors, they expressly require only that the ALJ's decision include 'good reasons . . . for the weight . . . give[n] [to the] treating source's opinion' – not an exhaustive factor-by-factor analysis."  *Francis v. Comm'r Soc. Sec. Admin.*, 414 F. App'x 802, 804 (6th Cir. 2011) (quoting 20 C.F.R. § 404.1527(d)(2)).  Ultimately, "[t]his procedural 'good reason' rule serves both to ensure adequacy of review and to permit the claimant to understand the disposition of his case."  *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 550-51 (6th Cir. 2010) (citing *Rogers*, 486 F.3d at 242).  That a treating physician's opinion is inconsistent with the record constitutes a "good reason" for not giving controlling weight to it.  *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 417-18 (6th Cir. 2011).

Here, the ALJ did not commit reversible error in her consideration of Dr. Palm's opinions, and substantial evidence supports her decision to give them little weight.  The principal reason the ALJ gave for discounting Dr. Palm's opinions – that those opinions were "grossly inconsistent with the evidence as a whole" and that the "physical examinations [in the record] were mostly unremarkable" – finds support in the record.  (Tr. 124).  First, none of Dr. Palm's voluminous treatment notes suggest the extreme limitations indicated in his Physical Assessment.  Instead, his notes show an inconsistent presentation of various symptoms, many of which were unrelated to Williams' severe impairments.  For example, throughout 2015, Williams sought treatment from Dr. Palm for complaints for sleep problems, knee pain, coughing, shoulder pain, and urinary incontinence.  (Tr. 393-94, 396, 517, 532, 536).[2]  Apparently, during these appointments, Williams did not present current complaints of her impairments (relating to back pain, hand

---

[2] Although Williams' impairments are referenced in the notes, they were not listed in the "Subjective" section outlining her current "concerns."

conditions/carpal tunnel, or headaches) on a consistent basis.  For example, on the following dates, she did not complain of any symptoms relating to carpal tunnel: August 18, 2015 (Tr. 390); December 14, 2015 (Tr. 521); April 26, 2016 (Tr. 509-10); July 25, 2016 (Tr. 505).  As the ALJ noted, on February 27, 2015, a week after Williams' alleged onset date, Dr. Palm wrote that her carpal tunnel was controlled, and her "symptoms [were] alleviated with Elavil."  (Tr. 404-406).  Further, Williams was only prescribed an elastic bandage for carpal tunnel on November 16, 2015, months after her alleged onset date of February 20, 2015.  (Tr. 524-28).

Regarding her headaches, a head CT study referred by Dr. Palm, conducted March 20, 2015, showed all normal findings.  (Tr. 416).  Two months later, on May 14, 2015, Williams did not indicate complaints relating to headaches.  (Tr. 536).  On several visits, her migraines were labeled "stable."  (Tr. 521, 524, 538).  And in February 2016, she again did not raise current complaints related to headaches.  (Tr. 517).

Although Williams indicated uncontrolled back pain *before* she completed physical therapy (for example, on February 27, 2015, March 27, 2015, and March 15, 2016) (Tr. 400-401, 513), her symptoms improved with physical therapy.  (Tr. 562, 565).  After completing physical therapy because her goals were met, she planned to start exercising again at Rehabilitation Institute of Michigan.  (Tr. 504-505).  Even though Williams sometimes complained of back pain, Dr. Palm repeatedly and consistently wrote that her back pain was "stable" and "controlled."  (*E.g.*, Tr. 393, 396, 509, 513, 535, 538, 541).  Unsurprisingly, in several instances, Dr. Palm did not write any suggested treatment or plan for Williams' back pain within the "Assessment and Plan" portion of his notes.  (Tr. 520, 524, 536; 538-39).

Williams' physical therapy records, which the ALJ discussed (Tr. 123), further support her decision to discount the extreme limitations imposed by Dr. Palm.  Over about a six-week period

in the spring of 2016, Williams attended physical therapy sessions for her carpal tunnel syndrome and back issues.  (Tr. 562).  She was discharged from physical therapy on July 1, 2016, because her goals were met, "maximal level [was] reached," and, significantly, "No further Occupational Therapy Intervention [was] Indicated . . ."  (Tr. 562, 565).

Initially, she began physical therapy only for her hand, not her back.  (Tr. 572-73).  As to her hand, observations from the end of treatment — July 1, 2016 — indicate that Williams met her initial goals, including the following: increased efficiency of self care when using the right hand as dominant, range of motion in stretching for the right wrist and hand, and partial decrease in hand pain.  (Tr. 563).  On that same day, Williams noted her pain at rest was 0/10, and with activity was 5/10, but the pain was dull and localized.  (Tr. 562).  Exacerbating factors were grasping, but it was noted that daytime wearing of a splint helped with pain reduction.  (Tr. 562).

Several weeks after she began treatment for her hand, on May 27, 2016, Williams also began physical therapy for her back.  (Tr. 565).  Again, she showed significant improvement with physical therapy.  While her initial functional measures indicated "severe limitation in a specific LADL affecting performance," her final level indicated "no limitation in a specific LADL."  (Tr. 566).  Similarly, Williams' subjective reports showed "significant increase[] in functional mobility" after physical therapy.  (*Id.*).  At the beginning of her treatment, at rest, her low back pain was 6/10, with activity was 10/10, and exacerbating factors were lifting and walking— notably, not standing or sitting.  (Tr. 574).  However, by the end of her treatment—also July 1, 2016—her low back pain at rest was 2/10, and with activity was 7/10.  (Tr. 565).  Her goals to have a reduction of pain to 2-3/10 were therefore deemed "partially met," with the "majority of PT goals achieved," noting that Williams wished to also "participate in open gym program once approved by MD [Dr. Palm]."  (Tr. 565).  Discharge notes also showed Williams' left gluteus

medius muscle, right gluteus medius muscle, and erector spinac muscles were all normal.  (Tr. 565-66).  Her final strength levels for specific joints, including hips and knees, were all 5/5, with the remaining areas within functional limits or not tested.  (Tr. 566).  "WNL," or "within normal limits," was indicated for Williams' range and motion for her spine, including flexion, rotation, and extension.  (Tr. 566).  In short, the physical therapy treatment notes provide additional substantial evidence supporting the ALJ's finding that Dr. Palm's opinions are inconsistent with the record as a whole.

The ALJ separately addressed, and rejected, Dr. Palm's opinion that Williams could use her left hand only 50 percent of the time (Tr. 124, 579).  The ALJ's assertion that the record evidence did not support such a limitation was accurate; Drs. Delly and Selwa specifically indicated in the EMG report that the test "does not adequately account for … the symptoms in the left upper extremity . . ."  (Tr. 560).

Several of Dr. Palm's opinions also seem to contradict other portions of the record.  Specifically, Dr. Palm opined that Williams could only sit for a *total* of four hours a day, and stand and walk (together) for a *total* of one hour per day.  (Tr. 579) (emphasis added).  That suggests Williams would need to lie down for the remainder of the work day.  However, at the hearing, Williams testified that she only lies down for only "an hour a day."  (Tr. 142-43).  Next, Dr. Palm wrote that fatigue is a side effect of medications; but, on several of his treatment notes, including his most recent note from July 25, 2016, he indicated that Williams did not experience fatigue.  (*E.g.*, Tr. 507, 515).  Finally, Dr. Palm opined that Williams would be absent more than four times per month due to her conditions, but nothing in the record appears to support this opinion.

Still, despite the above analysis of the record, Williams contests the ALJ's conclusion that the medical record was "unremarkable."  In doing so, Williams relies primarily on various

diagnoses or subjective indications of pain to support her argument; but, neither diagnoses nor subjective complaints show error by the ALJ.  Although Williams accurately points out that Dr. Palm "noted that [she] presented with arthralgias and myalgias," "the mere diagnosis of an impairment does not render an individual disabled nor does it reveal anything about the limitations, if any, it imposes upon an individual." *Dukes v. Comm'r of Soc. Sec.*, No. 1:10-CV-436, 2011 WL 4374557, at *6 (W.D. Mich. Sept. 19, 2011) (quoting *McKenzie v. Comm'r of Soc. Sec.*, No. 99-3400, 2000 WL 687680 at *5 (6th Cir. May 19, 2000)).  As to her subjective complaints, the ALJ did not dismiss them entirely, but rather simply found that while her "medically determinable impairments could reasonably be expected to cause the alleged symptoms . . . [her] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (Tr. 123).  Again, the physical therapy notes and other evidence discussed above adequately support the ALJ's finding in this regard.

Williams does note that an X-ray shows "a slight lumbar levocurvature, with lumbar lordosis, minimal vertebral endplate spurring, and minimal findings of spondylosis."  (Tr. 401).  But, Williams' argument misses the point.  The issue is not whether she has impairments – the ALJ found she had multiple "severe" impairments – or whether there is *any* medical evidence in the record documenting objective findings consistent with those impairments.  Rather, the issue is whether, overall, the ALJ supportably found that the extreme limitations imposed by Dr. Palm were sufficiently "inconsistent with the evidence as a whole" to omit them from the RFC.

The Court also notes that Williams' record citations selectively show the worst of her pain on a few occasions, rather than the progression of her conditions over the course of time, which ultimately, culminated in ongoing improvement with physical therapy, medication, and a stable

treatment regimen, as discussed *supra*.  For example, Williams accurately cites to Dr. Palm's note

that she was experiencing progressive symptoms with her back pain, including radiating pain, on

March 15, 2016; but, this was before she began physical therapy, which, as noted above, clearly

improved her back pain, symptoms, and functionable capabilities.

In sum, overall,[3] the ALJ provided "good reasons" for giving Dr. Palm's opinions limited

weight.  All of the foregoing constitutes substantial evidence supporting the ALJ's finding that Dr.

Palm's opinion was "grossly inconsistent with the evidence as a whole," which constitutes a "good

reason" for not giving it controlling weight, under relevant case law.  *See Reynolds v. Comm'r of*

*Soc. Sec.*, *supra*, at 417-18.  Moreover, earlier in her decision, the ALJ explained in greater detail

why the medical record was inconsistent with Dr. Palm's extreme limitations, as will be discussed

in greater detail *infra,* in Section 2[4].

## 2.   *The RFC Finding is Supported by Substantial Evidence*

As set forth above, the ALJ found that Williams retains the RFC to perform sedentary

work, with the additional restrictions that she can only frequently handle, finger, and feel with the

right hand; never be exposed to flashing light or light of greater brightness/intensity than found in

---

[3] The Court recognizes that the ALJ's discussion with respect to Dr. Palm's opinions was imperfect.  The ALJ wrote, "[Williams] was capable of walking thirty minutes at one time," whereas in response to a question about how far she could walk without taking a break, she testified, "A half an hour – half a block, I'm sorry."  (Tr. 124, 142).  However, earlier in her decision, the ALJ accurately noted that at the hearing, Williams testified that she was capable of "walking one-half block at one time."  (Tr. 123).  Thus, it seems clear there was no attempt by the ALJ to distort the record or to "use [Williams'] quick slip-up against [her]," as Williams asserts. (Doc. #15 at 18).  And, regardless of whether Williams testified to being able to walk one-half block or one half hour, in either case that was merely her own subjective report, which the ALJ appropriately discounted.  Indeed, as the Commissioner notes, the record also contains a note from a social worker indicating that Williams was attempting to lose weight by walking four days a week (Tr. 624), was taking care of two young grandchildren (Tr. 529), and had been walking with her daughter other than when she was sick or when it was too hot.  (Tr. 593, 604).

[4] Although framed as an argument relating to the treating physician issue, the Court will separately address Williams' argument that substantial evidence does not support the ALJ's RFC finding.

a typical grocery store; never be exposed to workplace hazards such as ropes, ladders, scaffolding, unprotected heights, or moving mechanical parts; and engage in work that requires some skills but no complex duties, such as work with an SVP of 3 or 4.  (Tr. 122-24).

Within her accompanying RFC analysis, the ALJ outlined the medical evidence supporting the RFC finding, and contradicting Williams' subjective indications of severe limitations.  For example, the ALJ wrote that Williams' migraines and hypertension are controlled with medication. (Tr. 123).  As to Williams' back pain, the ALJ wrote that

> [Williams] has received continued treatment for low back pain.  However, her pain was noted to have been stable with medication.  Physical examination on April 14, 2015 revealed unremarkable findings.  On April 13, 2016, [Williams] reported good physical condition without any changes. Upon completion of physical therapy in July 2016, [Williams] retained full range of motion in all four extremities, and demonstrated negative straight leg raising.  She reported the ability to stand thirty minutes and no difficulties with bathing or dressing.  She also reported significant increases in functional mobility.

(Tr. 123).

As to Williams' mental impairments[5], the ALJ found,

> [Williams] also received mental health treatment for depression, which was stable with Zoloft and Elavil. [ ] On March 30, 2015, it was noted that the claimant was doing much better, with improved mood, since starting therapy. [ ] On July 13, 2016, [Williams] reported less depression and isolation.  On August 1, 2016, it was noted that [Williams] was feeling lazy and not wanting to leave the house. [ ] Therefore, motivation seems to play a significant role in [Williams'] functional capacity.  There is no evidence of deterioration in her mental health condition since the prior decision.

(Tr. 124).

---

[5] This issue is addressed in greater detail below, when the Court considers Williams' argument that the Step Four finding is unsupported by substantial evidence due to the lack of social limitations in the RFC.

Regarding Williams' hand conditions, the ALJ explained, "[Williams] complains of right[6] carpal tunnel syndrome but there is no objective evidence or clinical findings to support a diagnosis.  Furthermore, it was noted that her carpal tunnel symptoms were alleviated with Elavil," which is supported by the record.  (Tr. 123, 404, 560).

Williams claims that the RFC is unsupported by substantial evidence because the RFC "must be rooted in some medical expert's opinion," and "an ALJ's determination of RFC without a medical advisor's assessment is not supported by substantial evidence."  (Doc. #17 at 21).  But Williams' argument lacks merit.  In *Mokbel-Aljahmi v. Comm'r of Soc. Sec.*, 732 F. App'x 395 (6th Cir. 2018), the Sixth Circuit recently rejected exactly such an argument, holding, "[w]e have previously rejected the argument that a residual functional capacity determination cannot be supported by substantial evidence unless a physician offers an opinion consistent with that of the ALJ."  *Id.* at 401 (citing *Shepard v. Comm'r of Soc. Sec.*, 705 Fed.Appx. 435, 442–43 (6th Cir. 2017) ("An RFC is an 'administrative finding,' and the final responsibility for determining an individual's RFC is reserved to the Commissioner.")).  Thus, an ALJ is not only qualified, but obligated, to review all record evidence to determine the RFC.  *See* 20 C.F.R. §§ 404.1545(a)(3),

---

[6] This appears to be a mistake, as the ALJ in fact recognizes that Williams has a severe impairment of right carpal tunnel syndrome.  (Tr. 120).  It appears the ALJ intended to make this finding as to Williams' left hand, as she later in the decision appropriately explained that "there is no evidence to support a fifty-percent limitation with *left* manipulative functioning.  There are no diagnostic findings showing an underlying condition that would cause manipulative limitations."  (Tr. 124) (emphasis added).  Indeed, the record shows some evidence of right carpal tunnel syndrome, not left carpal tunnel syndrome.  (*See* Tr. 560) ("These abnormal findings may be consistent, in part, with the numbness and tingling in digits 1-3 in the right hand, however, it does not adequately account for the numbness and tingling, pain, and weakness in digits 4 and 5 nor any [] symptoms in the left upper extremity on a peripheral nerve or muscle basis.").  Regardless, the ALJ's error was harmless as she properly noted that Williams' right carpal tunnel syndrome was alleviated with physical therapy, and cited to the physical therapy records showing her goals were met and that "No further Occupational Therapy Intervention [was] Indicated" as of July 1, 2016, with her right hand pain being 0/10 at rest.  (Tr. 123) (citing Tr. 561-77).

404.1546(c), 416.946(c) ("… the administrative law judge … is responsible for assessing your residual functional capacity."); *Mokbel-Aljahmi*, 732 F. App'x at 399 ("In formulating a residual functional capacity, the ALJ evaluates all relevant medical and other evidence and considers what weight to assign to treating, consultative, and examining physicians' opinions.") (quoting *Eslinger v. Comm'r of Soc. Sec.*, 476 Fed.Appx. 618, 621 (6th Cir. 2012)).  Here, the ALJ did just that, having considered the evidence of record as a whole, including all opinion evidence.[7]

In short, Williams bears the burden to prove her RFC, and she simply has not shown error in the ALJ's RFC finding.  Further, she has not shown the need for a medical expert opinion, beyond those already in the record, for any "bare" or "raw" medical data.  Similarly, she has not shown that the medical evidence, opinions, and other record evidence did not adequately apprise the ALJ of her functional limitations.  Indeed, for the reasons stated above, substantial evidence supports the ALJ's RFC finding.

### 3.  The ALJ's Step Four Finding is Supported by Substantial Evidence

At Step 4, the ALJ determined that Williams can perform her past relevant work as actually performed.  The ALJ explained, "In comparing [Williams'] residual functional capacity with the physical and mental demands of the work as a casino cashier, the undersigned finds that [she] is able to perform this work as actually performed pursuant to the [VE's] testimony."  (Tr. 125).  In support of her decision, the ALJ cited the VE's testimony that Williams' past work as a casino

---

[7] The cases on which Williams relies (Doc. #15 at 20) do not change the analysis.  First, those cases predate *Mokbel-Aljahmi*.  Second, none of them held that each element of the RFC determined by the ALJ must be found in a physician-issued opinion.  Rather, in each case, the court simply addressed whether the ALJ properly considered the entire record evidence, and whether, in light of the overall record, there was any raw medical data that required a medical interpretation, per the ALJ's obligation to develop the record.  In this case, for the reasons stated herein, the record did not require an additional medical opinion because the ALJ reasonably found it did not support Williams' allegations of severe functional limitations.

cashier was unskilled, light but sedentary as performed, and that, assuming the same RFC, Williams would be able to perform the requirements of her past job.  (*Id.*).

Williams now argues that the ALJ erred at Step Four "by failing to include any social limitations in her hypothetical question to the vocational expert, despite finding mild limitations in activities of daily living, social functioning, and concentration, persistence, or pace."  (Doc. #15 at 21).  Williams argues the error is "particularly harmful when considering the social aspect of [Williams'] past work," explaining that, in Williams' past job, "patrons would come up to her, and she would get their names and their address, city, state, ZIP, and bank account number, and spent the whole day getting this information and inputting it into the computer."  (*Id.* at 22).[8]

First, Williams appears to conflate the ALJ's finding "mild limitation" in social functioning at Step Two with an "impairment" that must be specifically reflected in the RFC.  While the ALJ did find Williams had mild limitation in social functioning at Step Two, Williams provides no authority that such a finding requires incorporation into hypothetical questions to the VE, or inclusion of a specific limitation in the ultimate RFC.  (Doc. #16 at 23-24).  Notably, Williams does not contend there is error in the ALJ's Step Two finding, that her depression or any other mental impairment is "nonsevere," and the Court, similarly, notes no Step Two error.

In fact, the ALJ gave the opinions of state consultant, Dr. Leonard Balunas, Ph.D., "great weight," due to his "expertise, impartiality, and consistency of his opinions with the evidence as a whole."  (Tr. 123-24).  Dr. Balunas opined that Williams' mental health condition was nonsevere, and there had been no material change in her condition since the prior decision.  The ALJ further

---

[8] It is Williams' burden to prove she is unable to perform her past relevant work at Step Four.  *See Preslar*, 14 F.3d at 1110.  However, in her motion, Williams cites no record evidence demonstrating social limitations, or any social impairment.  (Doc. #15).  For this reason alone, Williams fails to meet her burden, and has not shown error in the ALJ's decision.

noted his opinion that her condition has improved since the prior opinion.  (*See* Tr. 190-91) ("[Williams'] mood and affect appear to have improved from the reports of the ALJ decision, when she had a depressed mood and constricted affect.").

Other aspects of the record also support the ALJ's decision not to incorporate any social impairment or limitations in the RFC, or accordingly, into the hypothetical questions posed to the VE.  For example, Williams lives with her adult son, and goes on walks with her daughter, including public walks to the mall.  (Tr. 137, 624).  Williams also testified that she goes grocery shopping with her son.  (Tr. 143).  Mental health records from Easter Seals, dated August 1, 2016, indicate Williams' attitude/behavior, mood, affect, psychomotor activity, thought content, and attention/concentration, are all within normal limits.  (Tr. 584-90).  The records further show adequate judgment/insight, thought process is goal directed, intact fund of knowledge.[9]  These same records indicate Williams recently reported stable mood, and her condition is stable/improved.  (Tr. 585).  An earlier record from Easter Seals dated July 13, 2016 includes Williams reporting "less depression and less isolation."  (Tr. 593).  Although it seems Williams fluctuated in her symptoms in June 2016, this fluctuation corresponded to compliance issues with medication—it appears she was out of medication for about two months (apparently due to insurance issues)—during which she reported worsening mood and sleep.  (Tr. 596-97).  Even then, as the ALJ noted (Tr. 124), overall her records indicate that Williams' mental health improved with treatment.  (Tr. 459 ("[s]he has been doing much better since she has been in therapy.  The medicine has elevated her mood."); Tr. 460 ([Williams] reports in the last 3 months

---

[9] Also within these records were check marks in the following boxes: problem related to social environment, economic problems, occupational problems, and other psychosocial and environmental problems.  (Tr. 590).  However, there were no accompanying explanations within the subsequent summary, nor any other indicator of an impairment in social functioning.  (*Id.*).

she has noticed that she has started to think about [the loss of] her mother in a good way to help her stay positive . . .")).

Williams' testimony at the hearing also supports the ALJ's decision not to incorporate any social limitations into her RFC. For example, when asked what is keeping her from working, Williams responded, "my back problems and my hand," not any mental health or socialization issues. (Tr. 140). She again did not indicate any social limitations keeping her from work when asked by the ALJ if any other limitations, physical or psychological, keep her from returning to work. (Tr. 145).[10]

In sum, substantial evidence supports the ALJ's mental RFC finding, as well as her Step Four finding.

For all of the above reasons, and upon an independent review of the entire record, the Court concludes that the ALJ's decision is supported by substantial evidence.

## III.   CONCLUSION

For the foregoing reasons, the Court RECOMMENDS that the Commissioner's Motion for Summary Judgment [16] be GRANTED, Williams' Motion for Summary Judgment [15] be DENIED, and the ALJ's decision be AFFIRMED.

Dated: January 25, 2019                        s/David R. Grand
Ann Arbor, Michigan                          DAVID R. GRAND
                                                            United States Magistrate Judge

---

[10]Although at the hearing, Williams responded affirmatively to the question "you prefer to be alone?", this preference does not suggest the need for a limitation to be incorporated into the RFC, nor does it undermine the substantial evidence supporting the ALJ's decision not to include any social limitation in her RFC.  (Tr. 144).

## NOTICE TO THE PARTIES REGARDING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within 14 days of service, as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1981).  Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to Local Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

***Note these additional requirements at the direction of Judge Michelson:***

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc.  Any objection must recite precisely the provision of this Report and Recommendation to which it pertains.  Not later than 14 days after service of an objection, the opposing party may file a concise response  proportionate to the objections in length and complexity.  Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d).  The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc.  If the Court determines that any objections are without merit, it may rule without awaiting the response.

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on January 25, 2019.

s/Eddrey O. Butts
EDDREY O. BUTTS
Case Manager